UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAWAD H. HAKEEM | No. 23 CR 175<br><br>Judge John F. Kness |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Within a single week in March 2023, defendant Jawad Hakeem committed two armed bank robberies in Chicago. In each robbery, he terrorized the tellers and customers in the banks by threatening them and brandishing a gun. In the second robbery, defendant opened fire on a bank security guard who tried to stop him—firing repeatedly during a busy weekday afternoon in the Loop. Defendant not only stole thousands of dollars from the two banks; he created extraordinarily dangerous situations that put bank patrons and bystanders at grave risk. It is pure chance that defendant did not seriously injure or kill anyone.

Defendant is guilty of two counts of bank robbery and one count of discharging a firearm in relation to a crime of violence. To account for the exceedingly dangerous nature of defendant's crimes, his history of recidivism, and the need for deterrence, the Court should sentence defendant to concurrent terms of imprisonment of 110 months on Counts One and Three, followed by the mandatory minimum term of imprisonment of 120 months on Count Four. The Court should also impose a five-year term of supervised release.

# I. BACKGROUND

## A. Factual Background

On the night of March 2, 2023, Hakeem broke into a car parked in the driveway of a Naperville home and stole a gun from the vehicle. Presentence Investigation Report ("PSR") ¶ 13. The next day, armed with that weapon, he entered the Chase Bank on Clark Street in River North. *Id*. ¶ 11. Hakeem pointed the gun at the people in the bank's lobby and ordered two customers to lay face down on the floor. *See* Ex. A, Chase Bank Lobby Video. He told a teller that he would shoot the customers if the teller did not give him money. *See* Ex. B, Chase Bank Teller Video. The teller complied and placed money in a backpack that Hakeem had brought along. Defendant escaped with $2,002 of the bank's money. PSR at ¶ 11.

Six days later, defendant robbed another bank with the same stolen gun. Shortly before 3 p.m., Hakeem entered the Fifth Third Bank on South Wacker Drive and pointed the gun at the two bank tellers in the lobby. *See* Ex. C, Fifth Third Bank Video. He warned the tellers that his gun was loaded and demanded they put money in bags that he had brought along. The tellers began filling the bags with money, and Hakeem continued his threats—saying he would kill the women and asking one teller if she had children. While defendant waited for the tellers to fill the bags, a bank security guard was standing outside with his back to the bank's glass windows, unaware of the robbery in progress. As the guard spotted Hakeem, Hakeem pointed his gun at the guard, who began to back away and drew his service weapon. Hakeem

grabbed the bags of money from the tellers and went toward the bank doors. As the guard approached the doors and attempted to stop Hakeem from exiting, Hakeem fired his gun at the guard nine times, shattering the bank's windows. The guard returned fire and retreated. Hakeem ran out of the bank, pausing for several seconds to pick up money he had dropped during the shootout before running away. Hakeem stole a total of $23,900 in this robbery. He dropped $10,450 on the ground outside the Fifth Third Bank as he fled.

As a result of the shooting, office buildings in the area and the Ogilvie Transportation Center went on lockdown as law enforcement searched for the bank shooter.[1] Defendant was not apprehended that day.

Four days later, defendant was arrested by the Waukegan Police Department on unrelated theft charges.[2] PSR ¶¶ 13, 75. He admitted to having recently stayed at a Chicago motel. The gun Hakeem used in the bank robberies was found in his motel room along with Hakeem's belongings. *Id.* at ¶ 13.

[1] *See* Fox 32 Chicago, *Loop bank robbery: Suspect shoots security guard at Fifth Third Bank in Chicago*, available at https://www.fox32chicago.com/news/loop-bank-robbery-shots-fired-fifth-third-bank-chicago (last visited August 18, 2026).

[2] These charges were later dismissed.

### B. Procedural Background and Evaluations[3]

A grand jury indicted defendant on two counts of bank robbery, in violation of 18 U.S.C. § 2113(a); one count of brandishing a firearm during and in relation to a crime of violence (in relation to the Chase Bank robbery), in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and one count of discharging a firearm during and in relation to a crime of violence (in relation to the Fifth Third Bank robbery), in violation of 18 U.S.C. § 924(c)(1)(A)(iii). R. 18.

In July 2023, defendant exercised his right to *pro se* representation. R. 38, 40. Soon thereafter, the Court ordered a competency evaluation. R. 59, 64, 65. In December 2023, Dr. Diana Goldstein, a licensed clinical psychologist, of Isaac Ray Forensic Group evaluated defendant and concluded that he was competent to stand trial and to represent himself. *See* Ex. D, Goldstein Report (Under Seal), at 16-17. In her report, Dr. Goldstein opined that [redacted].

[3] In this memorandum, the government has redacted discussion of sensitive material relating to defendant's mental health contained within the Goldstein Report and Mitigation Report, both of which are filed as under seal exhibits.

In January 2026, defendant pleaded guilty to Counts One, Three, and Four of the indictment—both counts of bank robbery, and one count of discharging a firearm during and in relation to a crime of violence. R. 178.

In June 2026, defendant hired a mitigation expert, retired United States Probation Officer Zakary T. Freeze, to prepare a report (the "Mitigation Report") on his behalf. *See* Ex. E, Mitigation Report (Under Seal). The Mitigation Report concluded, relying primarily on statements from defendant and his mother, that [redacted].

## II. GUIDELINES CALCULATION AND OBJECTIONS TO THE PSR

The government concurs with the Guidelines calculation set forth in the PSR. The combined offense level as to Counts One and Three is 26. Defendant earns a total of eight criminal history points, placing him in Criminal History Category IV. The resulting Guidelines range as to Counts One and Three is 92 to 115 months' imprisonment, and Count Four carries a mandatory minimum term of imprisonment of 120 months.

## III. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to

determine the sentence to impose, after calculating the Sentencing Guidelines, the court must consider the statutory factors listed in § 3553(a)(1)-(7). *Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").

For the reasons set forth below, consideration of the statutory sentencing factors as applied to defendant demonstrates that a sentence of 110 months' imprisonment (within the Guidelines range) is sufficient but not greater than necessary on Counts One and Three, followed by a sentence of 120 months on Count Four.

**A. The Nature and Circumstances of the Offenses**

Defendant's weeklong crime spree, from nighttime car burglary to bank robbery shootout, was dangerous from start to finish. Any defendant who commits a bank robbery armed with a firearm terrorizes the bank employees and customers present during the crime and endangers their lives. But the two bank robberies defendant committed were particularly terrifying, dangerous, and violent. In each robbery, he brandished a loaded weapon at the people unfortunate enough to be in the banks. He coupled this with chilling, specific verbal threats, saying that he would shoot customers and kill tellers if he did not get the money he wanted. But defendant's actions at the Fifth Third Bank—where he shot *nine times* at a bank security guard who tried to stop him—are without question the most reprehensible

conduct of his crime spree. These were not warning shots to scare away the guard. They were fired directly at the guard and intended to seriously injure or kill him so that defendant could get away with the robbery proceeds. The hail of bullets that defendant unleashed caused the guard to fire his own weapon in self-defense. This shootout took place mid-afternoon in downtown Chicago with numerous bystanders present. Any one of the bullets that defendant fired or caused the guard to fire could have resulted in a fatality. That the guard suffered only a minor injury from broken glass, and that no one else was hurt, is a stroke of extraordinary luck. And this says nothing of the psychological trauma and fear defendant's actions inflicted—not only on the bank employees, but also on unsuspecting Chicagoans whose commutes halted amid an urgent search for an active shooter on the loose.

Since his arrest, defendant has neither recognized nor expressed remorse for the violent nature of his crimes and the resulting harm. In his December 2023 interview with Dr. Goldstein, defendant minimized the impact of these actions, saying: "Well, there was no harm. The only harm was bank notes were lost. The security guard claimed no injury…. Some trauma occurs to everyone involved in a bank robbery, but a judge will see there was no physical injury." Ex. D at 14. In the June 2026 interview with his mitigation specialist, defendant described his criminal history as non-violent, claiming, "What you can't find is that I harm people." When asked to describe the shooting, he "only recounted the incident in terms of his reaction

to the shattering of glass due to the gun fight." Ex. E at 26-27. Defendant ignores the exceedingly dangerous nature of his crimes. The Court should not.

**B. The History and Characteristics of Defendant**

The bank robberies represent a violent capstone to defendant's criminal history. Since age 17, Hakeem has had numerous arrests and run-ins with the criminal justice system. *See* PSR ¶ 64-75. At age 30, he began racking up a series of violent and theft-related convictions—including for retail theft, burglary, battery, aggravated battery, and possession of a stolen vehicle. *Id.* at ¶¶ 54-60; Ex. E at 14. In several instances (including the instant offenses), defendant committed crimes while on probation or other court supervision. *Id.* at ¶¶ 55, 60. This history also includes a pattern of defendant violating protective orders sought against him by family and romantic partners. *Id.* at ¶¶ 55, 72, 82; Ex. D at 7 (describing a restraining order in Toronto); Ex. E at 14 (describing a protective order defendant's father obtained against him in Waukegan). Even though some of those violations did not amount to a conviction, the Court may still consider this pattern as indicative of defendant's propensity for violence or harassment toward those nearest to him. *See United States v. Madison*, 689 F.2d 1300, 1313-15 (7th Cir. 1982) ("a trial court may also consider dismissed charges as evidence of character when determining the length of the defendant's sentence"); *United States v. Harty*, 930 F.2d 1257, 1267 (7th Cir. 1991). In sum, defendant has a lengthy criminal history, and his convictions cannot be attributed to youth.

Nor can defendant's criminal behavior be attributed to a lack of opportunity. He had ample educational opportunities and the support of two college-educated parents. By his own account, his family was well-connected, financially secure, and able to provide him and his siblings with a comfortable upbringing. Ex. E at 15-16 (describing his family's hired household help, his parents' education and advanced degrees, and their professional connections in Waukegan, Chicago, and elsewhere). Defendant speaks four languages and purports to have excelled in several jobs during his young adulthood. PSR ¶¶ 106-109; Ex. E at 21-22. Notwithstanding these considerable opportunities and resources, defendant has spent the better part of the last 20 years committing crimes. This is an aggravating factor that the Court should weigh in fashioning an appropriate sentence.

Defendant asserts that his mental health challenges precipitated his criminal conduct and constitute a mitigating factor the Court should consider. Ex. E at 12, 16-18. The evidence in the record as to defendant's mental health, however, is incomplete and inconsistent, leaving the Court without a reliable basis from which to draw conclusions about what weight this factor should be assigned. As an initial matter, Dr. Goldstein is the only licensed mental health provider to have examined defendant, and [redacted]

[redacted]

In contrast, the Mitigation Report, authored by retired U.S. Probation Officer Zakary T. Freeze, [redacted]. [redacted]

[4] The PSR includes many of the same statements reported by defendant.

[redacted]

[redacted]

[redacted]

- Defendant reported to Dr. Goldstein that he had never used alcohol or illicit drugs. Ex. D at 7. In contrast, in 2026, he claimed to have committed the bank robberies during a period where he was heavily using drugs and alcohol. Ex. E at 13, 20; PSR ¶ 99.
- Defendant reported to Dr. Goldstein that his father was deceased. Ex. D at 4. In 2026, defendant reported to Probation and Mr. Freeze that his father is alive, though in poor health. PSR ¶ 77; Ex. E at 15.
- Defendant gave differing details as to where he lived at certain points in his life—at turns reporting that he lived in the United States, in Canada, and in Ghana during the same periods. *See* Ex. E at 14-15 (detailing these inconsistencies).

[redacted] There is little basis for the Court to conclude defendant is now being truthful. And, even if the Court were to credit defendant's most recent account of his background, there is no evidence in the record that suggests defendant was unable to control his impulses or incapable of understanding the consequences of his actions at the time of the offenses. Thus, to the extent defendant's mental health can be considered a mitigating factor, it warrants only modest weight.

### C. The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, Protect the Public from Further Crimes of Defendant, and Promote Respect for the Law

The sentence in this case should deter and incapacitate defendant from future crimes. Defendant's decision to commit two planned, armed bank robberies demonstrates that the prior sentences of imprisonment imposed on him have had no deterrent effect. A lengthy sentence in this case is, as discussed above, necessary because of the gravity of defendant's crimes. But it is also necessary to cut short

defendant's escalating pattern of violent and theft-related offenses. But for his arrest for the instant offenses, defendant's track record suggests he may well have continued committing crimes increasing in seriousness. The sentence imposed on defendant should also serve the purpose of general deterrence by sending a message that, although bank robbery may hold the allure of being a lucrative crime, it carries stiff consequences that outweigh any prospect of personal gain—particularly where it involves the use of a firearm.

The sentence should also promote respect for the law. Though defendant purports to be well-versed in the law and professes an affinity for it, his conduct shows that he neither respects it nor believes it applies to him. *See* Ex. D at 7; Ex. E at 26. This is evident in his continued commission of crimes while under court supervision. It is also evident in defendant's efforts to delay and undermine these proceedings—including through his numerous filings claiming that the Court and the government were colluding against him (R. 111, 144), that his right to a speedy trial was violated while he was simultaneously being unfairly rushed to trial (compare R. 111 and R. 145), and that this Court "operates in a fraud" (R. 27). This disregard for the law and defendant's apparent lack of remorse for his crimes merit a lengthy custodial sentence.

## IV. SUPERVISED RELEASE

The government proposes a five-year term of supervised release. A five-year term, the maximum permitted as to Count Four, is necessary given the lengthy

custodial sentence defendant faces, his demonstrated unwillingness to comply with conditions of supervision in the past, and the support he is likely to need to address mental health, substance abuse, and other challenges associated with reintegrating into society after his term of imprisonment.

The government agrees with the Probation Office's recommended conditions of release, which are each appropriately tailored and reasonably related to the offenses of conviction, defendant's history and characteristics, and the goals of sentencing under § 3553(a).

## V. RESTITUTION

Consistent with the plea agreement, defendant owes a total restitution amount of $15,452. Of that amount, $2,002 is owed to Chase Bank, and $13,540 is owed to Fifth Third Bank.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 110 months on Counts One and Three, to run concurrent; a sentence of 120 months' imprisonment on Count Four, to run consecutive to Counts One and Three; a five-year term of supervised release; and restitution in the amount of $15,452.

Respectfully submitted.

ANDREW S. BOUTROS
United States Attorney

By: */s/ Sushma Raju*
SUSHMA RAJU
Assistant United States Attorneys
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300